[No. 52083-6.   En Banc.   July 24, 1986.]

METROPOLITAN PARK DISTRICT OF TACOMA, *Respondent*,
v. HAL E. GRIFFITH, ET AL, *Appellants*.

426

*Danielson, Harrigan, Smith & Tollefson,* by *Arthur W. Harrigan, Jr.,* for appellants.

*Davies Pearson, P.C.,* by *John C. Kouklis* and *Art Wang,* for respondent.

DURHAM, J.— This case involves two consolidated appeals. Hal E. Griffith appeals from a declaratory judgment determining the parties' rights under a concession agreement. He contends the trial court erred in deciding that two 10–year options to renew a concession agreement were unenforceable, and in concluding that the Metropolitan Park District of Tacoma did not breach the agreement

by denying his requests to serve liquor and make improvements. After Griffith filed his appeal, a fire destroyed certain facilities covered by the agreement. The District then brought motions to the trial court to cancel the concession agreement or a portion of it. The District appeals from the trial court's denial of these motions.

The Metropolitan Park District of Tacoma is a municipal corporation which provides parks and recreation in Tacoma and Pierce County. The District owns a number of parks and recreation areas, including Point Defiance Park, Wright Park, Wapato Park, Northwest Trek, a golf course, and several playgrounds and swimming pools.

Hal E. Griffith is in the restaurant and food concession business. In 1972, Griffith approached the Commissioners of the District with a proposal to develop a restaurant and other facilities at Point Defiance Park. At that time, the District had a concession agreement with another party.

By 1976, some of the facilities had seriously deteriorated, and the District advertised for proposals from other interested parties to operate the concessions. It appointed a committee of Commissioners who interviewed four applicants, including Griffith. After the full board considered the applicants, it designated Griffith as the person with whom it wished to negotiate further and appointed a committee to do so. Griffith presented a proposal to the board which included remodeling and cleaning up the Boat House Grill restaurant, substantial development of the Boat House Grill area, and ultimate development of a sit–down restaurant. As a result of these discussions, Griffith and the board contemplated future development along the lines of the proposal although no one expected that any of the development would necessarily take place. Both parties did expect that Griffith would enter into the Boat House Grill, clean it up, and begin operating it as quickly as possible so that the District would continue to realize the income generated by the Grill.

On June 13, 1977, the District and Griffith entered into a concession agreement which granted Griffith

the exclusive right or concession to sell food, beverages, souvenirs, gift items and similar merchandise, and to operate vending machines or other dispensing devices on or from any park now, or during the term of this Concession Agreement or renewal thereof, owned or controlled by the District . . .

except for certain park areas. It provided that: "Concessionaire shall have the right to occupy and use District's real estate and improvements thereon as may be reasonable to operate the existing and future concessions covered by this Agreement." The term of the agreement was 10 years. It also provided Griffith with options to renew "for two consecutive ten (10) year terms on the same terms and conditions." The parties specifically bargained for the provision for the options to renew. The agreement provided that, in return for the grant of the concession, Griffith would pay the District a fee based on specified percentages of his gross sales. It further provided that the District would pay for all utilities.

The agreement also contained provisions concerning additional concessions, repairs and improvements. As to additional concessions, section 5 of the agreement provided, in part:

In the event that the District shall decide that additional concessions should be opened or that "amusement" machines or devices not included in aforementioned concession categories be introduced, either by itself or through a Concessionaire, the Concessionaire shall be given the right of first refusal to install and/or operate said concessions under the terms and conditions set forth in this Agreement. . . .

Regarding improvements, section 9 of the agreement stated in part,

Concessionaire shall submit to the District in writing any plans for alteration or improvement to or upon the premises where any of the concessions are located, prior to commencing any such alterations. All such alterations or improvements shall be approved by the District in writing before Concessionaire proceeds therewith.

The agreement authorized Griffith to deduct the cost of

permanent improvements he made from the fee payable to the District, provided the District had approved their nature and cost in advance.

As for repairs, the agreement provided that Griffith would maintain equipment and trade fixtures used in the operation of the concessions, while the District would be responsible for repairing the buildings and improvements thereon where the concessions were operated. The agreement contained no provision requiring either party to rebuild in case of fire.

Griffith entered into possession of the Boat House Grill area on June 1, 1977. Its condition was worse than the parties had expected. Griffith made permanent improvements to the Grill, deducting the costs from fees due the District, as authorized in the agreement. Griffith made tenant improvements to the Grill at his expense, including furniture, fixtures and interior remodeling other than structural work. These initial improvements consisted of $70,000 in equipment and $20,000 in interior remodeling. Later, he spent an additional $10,000 on the Grill. He also invested approximately $20,000 in concession equipment in other areas of Point Defiance Park.

After Griffith took over, the Boat House Grill operated as a cafeteria–style restaurant.[1] The parties' expectations of increased rental income were not met. Griffith made numerous proposals to the Park Board to persuade it to permit consumption of alcohol and construction of a sit–down restaurant in the boathouse in order to increase revenues. The District declined to permit alcohol.

Griffith paid the rent as called for by the agreement. In the first 6 years of operating the Boat House Grill, Griffith made no profit on it. He made approximately $100,000 on his operations under the agreement as a whole during this period.

As time passed, the District became increasingly con-

---

[1] In addition to operating the Boat House Grill restaurant, Griffith operated a gift shop at the Grill, and other concessions in the park.

cerned that the agreement was not in its best interests. In June 1982, the District filed a complaint for declaratory judgment in superior court, asking the court to cancel the concession agreement. The complaint alleged, among other things, that the agreement was void for interfering with the District's governmental capacity, that its term was unreasonable and void for lack of consideration, that it created an unlawful monopoly and was void for lack of compliance with competitive bidding requirements. The District also alleged breach of contract by Griffith. Griffith denied the District's allegations and counterclaimed, alleging the District had breached the contract.

A judgment was entered on July 6, 1983. The trial court found that the provision on improvements in section 9 of the agreement "does not require the District to approve plans, so it is simply an agreement to agree", and that the provision on additional concessions in section 5 of the agreement "does not require the District to decide that additional concessions should be opened, so it is also an agreement to agree." Finding of fact 20. The trial court further found:

> The Agreement contains no provision which obligates the District to approve proposed improvements, and the Agreement is essentially a skeleton in that regard. There is nothing in the Agreement requiring the District to accept propositions for serving of liquor in the District parks or restaurants.

Finding of fact 35. The trial court also found that the parties had been unable to meet their objective of developing the boathouse area and that the agreement did not provide any mechanism by which the court could require the parties to take steps to do so. Finding of fact 32.

The trial court concluded that the provision on improvements in section 9 of the agreement and the provision on additional concessions in section 5 of the agreement were illusory and unenforceable. It further concluded that the remainder of the concession agreement was enforceable for its initial 10–year term, but that the agreement was

"unreasonable as to duration, and the options to renew are therefore not enforceable." The court concluded that the District did not breach the agreement in denying Griffith's requests to serve liquor and make improvements. The court also held:

In the event the District constructs new food facilities or other concession facilities, within any of the parks covered by the Agreement, Mr. Griffith will have the exclusive right to operate them during the term of the Agreement unless they are the types of concessions not expressly included in the Agreement, in which case Mr. Griffith will have the right of first refusal as to such concessions.

Conclusion of law 21.

Griffith appealed to the Court of Appeals, assigning error to the above findings of fact and contending the trial court erred in holding that the options to renew were unenforceable, and in holding the District did not breach the agreement in denying his requests to serve liquor and make improvements.

On September 6, 1984, after Griffith's appeal was filed with the Court of Appeals, a fire occurred at the boathouse complex, completely destroying the restaurant and gift shop operated by Griffith. Subsequently, the District brought a motion in superior court for an order to declare the lease of the boathouse and gift shop terminated. A hearing was held on the motion on October 12, 1984. In the hearing, the judge stated that the court was bound by its previous conclusion of law 21, and Griffith would have the rights designated in that conclusion if the District chose to rebuild. On October 18, 1984, the District brought a new motion for the court to declare the entire concession agreement rescinded. On October 26, 1984, the judge denied both the motion to cancel the lease and the motion to rescind the agreement.

The District appealed the court's denial of its motions to the Court of Appeals. The District then moved to consolidate Griffith's appeal of the declaratory judgment declaring

the parties' rights under the concession agreement and the District's appeal of the denial of its motions. The Court of Appeals entered an order consolidating the appeals. The case was then transferred to this court pursuant to RAP 4.3.

I

GRIFFITH'S APPEAL

Unreasonable Duration

The first issue on Griffith's appeal is if the trial court erred in holding that the concession agreement was unreasonable in duration, and the two 10–year options to renew were therefore unenforceable.

■ The District's operation of concessions is a proprietary, rather than a governmental, function. When a municipal corporation enters into a contract pertaining to proprietary matters which extends over a long period of time, the contract is prima facie valid absent a showing of unreasonableness. 10 E. McQuillin, *Municipal Corporations* § 29.100 (3d ed. 1981); *Washington Fruit & Produce Co. v. Yakima,* 3 Wn.2d 152, 163, 100 P.2d 8, 103 P.2d 1106, 128 A.L.R. 159 (1940). The reasonableness of the term of such a contract is a question of fact. *Metropolitan Seattle v. Seattle,* 57 Wn.2d 446, 460, 357 P.2d 863 (1960); *Washington Fruit,* at 164.

The trial court decided the agreement was unreasonable as to duration, and the options to renew were unenforceable for three reasons: (1) the concession portion of the agreement was "close to being a monopoly"; (2) there was evidence that Griffith's investment "would easily be amortized over 10 years"; and (3) "because of the illusory provisions of the Agreement relating to improvements and the consequent inability to meet the objectives of development of the Boat House area and the additional concessions". These reasons will be reviewed in that order.

First, we consider if the term of the agreement is unreasonable because the agreement created nearly a monopoly. It is true that the agreement granted Griffith a virtual monopoly over concessions. However, we find no evidence

in the record that this situation rendered the long–term agreement unreasonable. To the contrary, the evidence indicates that the board decided it was in the District's best interest to grant one concessionaire exclusive control over its concessions. A board member testified that "[w]e didn't feel this was a good policy for the Park Board to have . . . many people to deal with, that one should be in control and keep it going." Report of Proceedings, vol. 2, at 203. This is a valid reason. The operation of concessions in a public park lends itself to exclusive control by one enterprise rather than competition among many, and there is no substantial evidence to the contrary. Thus, the trial court's reliance on this factor was erroneous.

▮ Second, we consider the trial court's determination that the options to renew were unreasonable because Griffith's investment would be amortized over the initial 10–year term of the agreement.[2] Frankly, we fail to see the relevance of Griffith's period of amortization to the reasonableness of a 30–year lease term. Moreover, the trial court's reliance on the amortization factor is inconsistent with one of its own findings of fact that ". . . According to the expert testimony . . . periods of 25–30 years, inclusive of options, are normal and reasonable in the restaurant business, given the same initial investment per square foot as that made by Mr. Griffith in the Boat House Grill." Finding of fact 21. The District did not challenge this finding. An unchallenged finding of fact is a verity on appeal. *Sherwood v. Bellevue Dodge, Inc.*, 35 Wn. App. 741, 746–47, 669 P.2d 1258, 676 P.2d 557 (1983). Given this finding, we must conclude that the two 10–year options to renew were not unreasonable in light of Griffith's investment.

We next address the trial court's conclusion that the

---

[2]Initially, Griffith disputes the trial court's finding that Griffith's investment would be amortized over 10 years. There is, however, substantial evidence to support it. Griffith's total investment was $120,000, at least $90,000 of which was for equipment. He made approximately $100,000 on his operations under the agreement as a whole in the first 6 years. He also depreciated the equipment over a 10–year period.

agreement was of unreasonable duration because of the illusory nature of the agreement's provisions on improvements. Griffith assigns error to the trial court's findings and conclusions that the provisions on additional concessions and improvements in sections 5 and 9 of the agreement were merely "agreements to agree" and, therefore, did not create enforceable promises by the District to proceed with additions or improvements. A supposed promise is illusory when its provisions make its performance optional or discretionary on the part of the claimed promisor. *Wharf Restaurant, Inc. v. Port of Seattle*, 24 Wn. App. 601, 609, 605 P.2d 334 (1979). Section 5 of the agreement provides that "[i]n the event that the District shall decide that additional concessions should be opened", Griffith has the right of first refusal to install and operate them. This provision gives the District complete discretion to open additional concessions. Thus, the claimed promise to open additional concessions is illusory and, therefore, unenforceable. Section 9 of the agreement provides that "[a]ll . . . alterations or improvements shall be approved by the District in writing before Concessionaire proceeds therewith." The District is not obliged to allow improvements under this provision. Again, any supposed promise to make improvements is illusory, and the trial court correctly held that there was no enforceable promise on the part of the District to allow improvements.

■ However, that fact does not render the options to renew the agreement unenforceable. When an option agreement is a subsidiary part of a larger transaction, as where a party is given an option to renew a contract, the consideration for the option itself is rarely a definitely determinable portion of what the option holder gives to the other party. The parties need not make a separate valuation of the option in order for it to be enforceable. 1A A. Corbin, *Contracts* § 263 (1963).

In this case, it appears that the consideration for the options to renew was not distinguished from the consideration which Griffith gave for the contract as a whole. In fact,

the agreement seems to indicate that the consideration for the initial term and the options was the same. Section 4 provides that "[i]n return for the grant of the concession herein", Griffith will pay the District certain percentages of gross sales, both during the initial term and the renewal terms. We conclude that Griffith's promise to pay these fees and to operate the concessions constituted consideration for the options to renew as well as the initial term. Furthermore, there is no evidence which clearly supports the District's assertion that future development alone was the basis for the options to renew. Thus, the fact that the District was not obligated to allow future development does not render the options to renew unenforceable for lack of consideration.

The District also asserts that the lack of an enforceable provision requiring it to agree to improvements frustrates the parties' purpose of developing the area, and therefore renders the options to renew unreasonable. However, the agreement does not preclude the District from proceeding with such developments. The District still has the freedom to decide if improvements should be made. Thus, the illusory nature of the provision on improvements does not constitute a frustration of purpose.

The District makes two additional arguments for finding the options to renew unreasonable which were not addressed by the trial court. First, it asserts the options to renew are unreasonable because they interfere with the District's governmental functions. However, since the operation of concessions is a proprietary function, this argument is inapposite.

The District further asserts that the options are unenforceable because it did not not employ competitive bidding requirements in selecting Griffith. The District cites certain statutes which it contends require a metropolitan park district to employ such bidding. However, none of these statutes clearly imposes such a requirement on metropolitan park districts. *See* RCW 35.58.180; RCW 39.30.020. Moreover, RCW 35.61, the chapter specifically governing

metropolitan park districts, does not mention competitive bidding.

The District also refers to a resolution it adopted in 1976 outlining a "formal purchasing policy". This resolution states, "competitve [sic] prices or bids shall be obtained for all purchases and public works and improvements. Contracts are to be awarded to the lowest and 'best responsible' bidder." The resolution also states, however, that where "there is only one firm available that can meet the needs of the ordering department", the buyer is allowed "to award the bid without seeking bids on the assumption that it is being given to the lowest and best bidder." Thus, the resolution does not require competitive bidding where the District decides there is only one qualified firm. Furthermore, it is questionable if this resolution even applied to the concession agreement, since the agreement was not technically a "purchase". We conclude that no provision clearly required the District to employ competitive bidding in entering into the concession agreement.

In summary, we are unable to find substantial evidence to support the trial court's decision that the options to renew the agreement were unreasonable and unenforceable. First, there is no evidence that the monopoly character of the agreement makes its duration unreasonable. Second, Griffith's ability to amortize his investment in 10 years does not mean that a longer term is unreasonable. In fact, the evidence shows that the two 10–year options to renew were reasonable given Griffith's investment. Third, the fact that the District had no obligation to permit additions and improvements does not make it unreasonable to bind it to a potential 30–year term. Furthermore, the options to renew do not interfere with the District's governmental functions. Finally, the District did not violate competitive bidding requirements in selecting Griffith. We conclude that the District has not shown that the options to renew are unreasonable so as to overcome the presumption of their validity. The trial court's holding that the options to renew are unenforceable is, therefore, reversed.

## Breach of Agreement

The second issue on Griffith's appeal is if the trial court erred in concluding the District did not breach the agreement by denying Griffith's requests to serve liquor and make improvements. The trial court clearly was correct in reasoning that, since the District was not under any contractual obligation to approve such requests, it was not in breach for denying them. No provision of the contract obligated the District to allow Griffith to serve liquor or make improvements.

Griffith further contends, however, that even if the District had no obligation to approve his proposals, it did have an implied obligation to consider them on their merits. Griffith asserts that the District refused to consider his proposals unless he agreed to void the existing agreement, and thus it breached this implied obligation.

In every contract there is an implied covenant of good faith and fair dealing which obligates each party "to cooperate with the other so that [each] may obtain the full benefit of performance.'" *Lonsdale v. Chesterfield,* 99 Wn.2d 353, 357, 662 P.2d 385 (1983) (quoting *Miller v. Othello Packers, Inc.,* 67 Wn.2d 842, 844, 410 P.2d 33 (1966)). Although the parties to this agreement did not anticipate that the future development which Griffith had initially proposed would necessarily occur, they did contemplate such development. Thus, under its implied covenant of good faith, the District may have had an implicit obligation to consider Griffith's proposals for changes and improvements.

However, even assuming the District had such an obligation, the evidence does not support Griffith's assertion that the District refused to consider his proposals. The record indicates that the District did take Griffith's proposals seriously and discussed them. It is true that, in late 1981, the Director of the District suggested to Griffith that the existing agreement be voided before the parties proceeded with any improvements. However, this appears to have been a good faith effort to modify the existing agreement,

which the Director considered unworkable. Thus, the evidence shows that the District considered Griffith's proposals in good faith.

## II
### THE DISTRICT'S APPEAL

As a threshold matter to the District's appeal, we must review a procedural challenge raised by Griffith. He contends that the post–judgment motions made by the District, and which are the subject matter of its appeal, do not come within RAP 7.2(e): "The trial court has authority to hear and determine (1) postjudgment motions authorized by the civil rules . . . and (2) actions to change or modify a decision that is subject to modification by the court that initially made the decision." Griffith argues the District's motions did not fall within either of these categories. However, the District contends that its motions were authorized by CR 60(b)(6) and (11), and thus fall within the first category of RAP 7.2(e).

CR 60(b) provides in part:

On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons:

. . .

(6) . . . it is no longer equitable that the judgment should have prospective application;

. . .

(11) Any other reason justifying relief from the operation of the judgment.

This provision was designed to deal with problems arising under a judgment that has continuing effect, where a change in circumstances after the judgment is rendered makes it inequitable to enforce the judgment. 4 L. Orland, Wash. Prac., *Rules Practice* § 5713, at 545 (3d ed. 1983). *Cf. In re Marriage of Giroux*, 41 Wn. App. 315, 322, 704 P.2d 160 (1985). The District essentially argued in its motions that the fire constituted a changed circumstance that warranted relief from the court's original judgment. Thus, its motions were authorized by CR 60(b)(6) and it was proper

for the trial court to hear them pursuant to RAP 7.2(e).[3]

Griffith also contends that the District did not comply with RAP 7.2(e) because it did not seek the appellate court's permission for the trial court to decide its motions. RAP 7.2(e) provides in part, "If the trial court determination [of the post–judgment motion] will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the entry of the trial court decision. . . ." Under this provision, permission of the appellate court must be obtained only if the trial court determination will change a decision then under review by the appellate court. In the present case, the trial court's determination to deny the District's motions for relief from the judgment did not change the decision being reviewed by the appellate court. Thus, the District was not required to seek the appellate court's permission before the trial court entered a decision on the motions. We hold, therefore, that the District's post–judgment motions were procedurally correct.

Accordingly, we next consider if the trial court erred in denying the motions. Under CR 60(b)(6), the trial court was authorized to relieve the District from its final judgment if it was "no longer equitable that the judgment should have prospective application".

The District contends that the trial court should have granted its motions on the grounds that it was excused from performing the agreement under the doctrines of impossibility and commercial frustration. Each will be addressed separately below.

The doctrine of impossibility excuses a party from performing a contract where performance is impossible or impracticable due to extreme and unreasonable difficulty, expense, injury or loss. *Thornton v. Interstate Sec. Co.*, 35

---

[3]Since CR 60(b)(6) applies, we need not consider whether the motions could be brought under CR 60(b)(11). Use of CR 60(b)(11) is limited to situations not covered by any other section of the rule. *State v. Keller,* 32 Wn. App. 135, 140, 647 P.2d 35 (1982).

Wn. App. 19, 30, 666 P.2d 370 (1983); Restatement of Contracts § 454 (1932). The event which renders performance impossible must be fortuitous and unavoidable on the part of the promisor. *Thornton,* at 31. When the existence of a specific thing is necessary for the performance of a contract, the fortuitous destruction of that thing excuses the promisor unless he has clearly assumed the risk of its continued existence. 18 S. Williston, *Contracts* § 1948 (3d ed. 1978); Restatement of Contracts § 460 (1932).

The District argues that the fire was a fortuitous unavoidable event which rendered performance under the agreement impracticable. It asserts that the destruction of the restaurant and gift shop eliminated the bulk of the subject matter of the agreement.

We agree that the fire which destroyed the boathouse was fortuitous and unavoidable, but we are not persuaded that it rendered the District's performance under the agreement impossible or impracticable. The District's suggestion that the existence of the boathouse was essential to its performance is not well taken. The agreement did not obligate the District to furnish the boathouse to Griffith. Rather, the District was only required to allow Griffith to operate concessions in its parks, to permit him to occupy and use its real estate and improvements for such operations, and to perform certain activities as to existing and future concessions, such as making certain repairs and furnishing utilities. The destruction of the boathouse did not alter or impede the District's ability to perform these obligations. The fire did not make it impossible or impracticable for the District to perform, and therefore the defense of impossibility is unavailable to the District.

The District further argues that, alternatively, the portion of the concession agreement concerning the lease of the Boat House Grill and gift shop should be canceled, on the ground that this portion of the agreement assumes the continued existence of the boathouse. There is, however, no evidence that the part of the agreement which District refers to as the "lease portion" depends on the existence of

the boathouse. That provision does not specifically refer to the boathouse. It is far broader, granting Griffith "the right to occupy and use District's real estate and improvements thereon as may be reasonable to operate the existing and future concessions covered by this Agreement." The destruction of the boathouse does not hinder the District from performing according to this provision. It can still allow Griffith to occupy and use the remaining concession facilities and any future ones which may be developed. Therefore, we decline to cancel any portion of the agreement on grounds of impossibility.

■ The District next contends that it should be excused from performing the entire agreement under the doctrine of commercial frustration. This court has adopted the following definition of commercial frustration:

> Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears.

*Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.*, 96 Wn.2d 558, 562, 637 P.2d 647 (1981) (quoting Restatement of Contracts § 288, at 426–27 (1932)). Commercial frustration "is limited to cases of extreme hardship where the event was not foreseeable and counterperformance is nearly or totally destroyed." *Thornton v. Interstate Sec. Co.*, *supra* at 31 n.3.

The District argues that the primary object of the agreement was to provide a restaurant and gift shop at the boathouse complex and that the fire was an unforeseeable event which frustrated this object through no fault of the District. The District further contends that the fire destroyed the value of Griffith's counterperformance. It notes that, since there are no longer any sales from the boathouse, no rent is provided to the District from this source. It further asserts

that the sales from the boathouse provided the bulk of rental income under the agreement, compared to the income generated from other concessions, so the entire concession agreement should be canceled.

We do not believe the main purpose of the agreement was the operation of the concessions in the boathouse. It is true that the trial court found that the parties expected Griffith to take over the Boat House Grill, clean it up, and begin operating it so the District would continue to realize the income from it. The agreement, however, covers other concession facilities besides the boathouse. It applies to all existing and future concessions in parks owned or controlled by the District. The District is still able to benefit from the operation of these facilities and to reap income from such operations. Thus, Griffith's counterperformance under the agreement still has value. Furthermore, the District is free to build new restaurant and gift shop facilities if it chooses, thus restoring its lost rental income. The parties can still function under the existing agreement with respect to such facilities. In summary, the destruction of the boathouse did not clearly frustrate the purpose of the contract, imposing such extreme hardship on the District that it should be discharged from performing its duties.

In conclusion, we reverse the trial court's decision that the two 10–year options to renew the concession agreement are unenforceable. The trial court's holding that the District did not breach the agreement in denying Griffith's requests to serve liquor or make improvements is affirmed. Finally, we affirm the trial court's denial of the District's motions to cancel the lease and concession agreement.

DOLLIVER, C.J., UTTER, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., and BEVER and JAMES, JJ. Pro Tem., concur.

Reconsideration denied November 18, 1986.